And next we will hear United States v. Percoco and Aiello. May it please the Court, Alexandra Shapiro for Stephen Aiello. The jury that convicted Mr. Aiello was presented with two alternative theories of honest services fraud conspiracy. An as-opportunities-arise theory that a payment was made to Percoco when he was not a public official to perform official acts as opportunities arise after he returned to public service, and a Margiotta theory that the payment made was for an act performed while Mr. Percoco was a private citizen. Both theories are legally invalid. The as-opportunities-arise theory is legally invalid under Silver, and the Margiotta theory is legally invalid because Margiotta is not good law and was not a theory in the indictment. But at a minimum it doesn't completely abandon the as-opportunities-arise theory. It says what you have to prove is that there was agreement to act on a particular matter or question as opportunities arise. So with that being how it's now cabined, tell us why it wouldn't apply in these circumstances. Well, first of all, the jury charge is incorrect. Oh, no. I understand that. I understand that. I'm wondering why it's not harmless error. Fair point. I was about to answer that. I didn't make that clear. So it's not harmless error because the government introduced evidence in the case of two acts performed in 2015. It urged the jury to rely on the theory extensively, and I would like to go through several of the arguments the government made in summation. And we know that this case deliberated for eight days, required two Allen charges to convict, and that there were divergent verdicts between Mr. Aiello and his partner, Joseph Girardi, on this particular count, and Mr. Girardi was not linked to one of the acts in 2015, which was the raise for Mr. Aiello's son. But the government stressed this instruction and its as-opportunities-arise theory in the summation. In the main summation, it mentioned the issue no less than four times and said things along the lines that these were payments that obligated Prococo to do what he could to benefit Aiello and Girardi, and then went on to discuss all three of the acts. That was at Appendix 647, Trial Transcript 5952. They said he took actions for core as opportunities arose, Appendix 647, 5953. There are a couple of other examples at Trial Transcript. Sotomayor, I understand that they relied on this theory, but for instance, on the COR part of the scheme. And that, Your Honor, just to be clear, that's all I'm addressing. Mr. Aiello is not involved in the other part of the case. That's very important. So you want to stay focused on which part the CPO is? No, no, no. I'm sorry. Mr. Aiello is a principal in COR, and he has nothing to do with the CPV. I'm sure Mr. Prococo's counsel — Yes, so the COR. That's all I'm talking about. So the labor peace agreement, right? Yes. The labor peace agreement was the only matter to be influenced. I understand you have an argument about whether there was official action, but on this, on the opportunities-arise theory and whether it's harmless under Silver's explanation of what that can now mean, what other matter was there to influence other than the labor peace agreement? Well, the point is, this — There was either an agreement on that or there was nothing. Well, just to be clear, we are not arguing sufficiency on this. We're only arguing harmless error on this. And the standard is that this Court has to essentially be certain that it's not conceivable that a rational jury could have acquitted had they been profitable. But what other matter or agreement — I mean, if they found an opportunities-arise theory of liability or guilt, it could only be on the labor peace agreement, right? No. On the COR? What else could it have been? Because the jury — what the jury was instructed was that the government didn't have to find an agreement for a specific official act or matter. They — they — they — that's why there was a — it was erroneous. So you're saying it's an open-ended agreement. The jury's instructed on that and may have convicted based on the raise to Aiello's son. Exactly. And the Aiello's son raise has nothing to do with what the payments were about, because it happens long after that agreement is made, right, according to the government's theory? That wasn't their theory below, Your Honor. And below, they argued repeatedly, and — and I — I mentioned a bunch of examples, but I'll mention more. But they — they argued repeatedly to the jury that the payments were made for him to take official actions as needed, as opportunities arise. And then they pointed to three things, including two acts in 2015, the second of which was the — the raise for the son. And — and the — the point is that having — and — and just my last example is in the rebuttal at a page — appendix page 651. The prosecutor described all three of the acts and then said that they were all in exchange for the payment, and — and then referenced the erroneous instruction and said that they just have to agree that he would advocate for them as opportunities arise. And that's exactly what he did three times for Core. That's all it takes, an agreement to exchange money for official action. And under the Harmless Error Standard, this Court cannot deny Mr. Aiello a new trial unless it is certain that he — a properly instructed jury would not have convicted. Your point is that the Aiello raise is akin to the Taub proclamation in Silver. Is that your point? I mean, I hadn't thought of it that way, but one could say that. But the point is that this jury, the only relevant distinction between Mr. Aiello, who had convicted on this count, and Mr. Girardi, who had acquitted on this count, is this raise. And, in fact, Mr. Girardi was well aware of the payments, according to the government's evidence. Todd Howe, the government's cooperator, testified that he had conversations in June and July of 2014 that included Mr. Girardi about payments for official action. And then the — all the events leading up to this LPA business in late November and early December, those were communications with Mr. Girardi, not Mr. Aiello. Girardi was the one kind of running it. So the jury clearly understood that he was involved in whatever dealings CORE had with Howe about Prococo taking action on these labor issues, and they acquitted Girardi of that. So there was no difference in the evidence, and if anything, Girardi was more involved in the events that took place in — in 2014. And so this Court cannot have confidence that this jury would not have acquitted Mr. Aiello had it been properly instructed, because if it had been properly been instructed, it couldn't have considered these acts that occurred in 2015, including for the son's raise. Thank you. Do you have some time for rebuttal? Thank you. Your Honor, may I just — there's one other thing I neglected to mention. Go ahead. I do want to ask the Court to continue Mr. Aiello's bail, the bail panel that granted bail deferred to this panel to continue it through dependency of the appeal. All right. We'll — we'll take that under advisement. Good morning, and may it please the Court, Michael Yeager for Joseph Prococo. I'd like to focus my argument today in applying this Court's recent decision in silver to Mr. Prococo's case, and specifically to the CPV side mostly, and to harmless error, because this was a very close case for the government. The jury deliberated for eight days and received two Allen charges before it rendered a verdict. When it did, that verdict acquitted Mr. Prococo on half the charges that he faced and deadlocked on all counts against Mr. Kelly, his only co-defendant on the energy company side of the case. So it was very close. And the jury charge here had an error. Of course, the question is whether it is harmless. Essentially, this is the opposite of the sufficiency standard. If it wasn't irrational for a jury to acquit or even just deadlock, then the error wasn't harmless. Now, the government theory at trial was that Prococo made a quid pro quo arrangement with Kelly in the fall of 2012 at a dinner in Danbury, Connecticut. The indictment says that this arrangement began in 2012, and in the closings and the rebuttal, the government makes clear its theories that it's that dinner in Connecticut, quote, where the details of the quid pro quo arrangement are worked out. So the error is not harmless if any rational jury could harbor doubt that there was a promise to take official action on an identified matter at that 2012 Danbury dinner. And it couldn't have been a promise on reciprocity because reciprocity wasn't identified or even contemplated at the time of the alleged agreement in 2012. Kelly was not aware of it in 2013, much less Prococo. And yet, the government relied heavily on reciprocity at trial. Roberts. They did talk about specific projects at the dinner, did they not? At least that's what the evidence. The allegation, the testimony by Todd Howe is that the PPA came up. The testimony is not that reciprocity came up at all. There is no testimony about that. And if the jury relied on reciprocity as the charge permitted them to and as the government informed them to do at the dinner, it would be a reason to grant a new trial. Your Honor, the first point I'm simply making is that the jury may have relied on There are other problems with the dinner, and I will address those. Silver says you have to understand the matter on which you are going to act corruptly when you accept the payment. It doesn't necessarily have to be when you first enter into the agreement. And I would just pose to you the thought that this was an expanding agreement and that the acceptance of payments after the PPA kind of went a little bit awry and reciprocity was the focus and, indeed, actions were taken and payments were then accepted would support that. But let me hear you on why we shouldn't be thinking that way. The government cannot save this case with a reciprocity agreement. They charged this as an as-opportunity-arise theory, and the theory at trial was that the quid pro quo arrangement was made. I'm sorry. Silver says that you have to understand what matter you're agreeing to, not necessarily at the start, but as you accept payments. That was not how this case was indicted or tried. The government took upon itself a different approach, and the defense was designed around that approach. The government made very clear, and the jury charge made very clear, that this was the way as-opportunity-arise was going to work. They can't switch theories now and say that the arrangement or the agreement was made at the time. I'm sorry. I thought you said they very much tried it on the theory of reciprocity. They tried it on the theory that all they had to do was prove some kind of general agreement, and then as opportunities arose, Mr. Prococo acted on them, and reciprocity was very much 100 percent merely an opportunity that arose. They did not make this theory about the receipt of payments and the agreement being at the time of the receipt of payments. That was not at trial. And we would have tried this case quite differently if they had. Sotomayor, go ahead. Let me try to make clear what my concern is. Reciprocity starts to be—there starts to be evidence of reciprocity. There starts to be evidence of the defendants taking action to do reciprocity. You say that's an opportunity that arose, but it's also a discreet matter, and to the extent that payments were received at that point, Silver seems to suggest that as long as you understand when you accept the payment that you're going to assist in a matter, in a corrupt way, that that can be enough. And I'm wondering what other matter there was that the jury could have thought was the agreement among the parties at that point in the scheme. They clearly could — the government's theory is that they could have relied on the PPA. I disagree respectfully with the idea that the government can walk away from its indictment, which says that this begins in 2012, that the arrangement — that the arrangement was made in 2012, and all of their arguments at trial, that the dinner was the event. But if the dinner's the event, they have to rely on the PPA, and there are major problems with that. Among other things, the only person to testify about any alleged promise at that dinner to take official action is Todd Howe, the government's cooperator. It's important to note that on harmless error review, the government does not receive the benefit of the doubt on witnesses' credibility, especially cooperators whose credibility was seriously contested at trial. This Court, Gordon, 1993, error is not harmless, where the government's case rested largely on the testimony of a cooperating witness whose credibility was seriously contested. Howe had his bond revoked in the middle of trial after cross-examination. His credibility was quite contested. And that history of altering Prococo's emails and putting them off as if Prococo had said it could strongly suggest to a rational jury that Howe would add things to oral conversation as well, secretly. His testimony isn't worth much. But all he said happened at that 2012 Danbury dinner was that Prococo agreed to keep abreast of or keep an eye on CPV's project. That's not an official act. And there are a lot of other reasons to doubt it as well. I mean, this was hotly disputed at trial. All Prococo did was set up five meetings for Kelly over four years. He didn't attend any of these meetings. No public official, no one at those meetings testified they'd been pressured by Prococo. No public official testified that they'd been pressured by Prococo on the PPA. And Prococo didn't have authority to grant the PPA. An independent commission had that authority, and they never did it. All these facts were part of Kelly's theory of the case, and the jury deadlocked on Kelly. So a court cannot conclude beyond a reasonable doubt that a rational jury could take the government's view at trial in the indictment of how this arrangement began. They now want to change this and make it that they used the reciprocity differently than they did. They used it a lot, but not in the way that Your Honor is suggesting. And the jury gave us no sign whether they relied on the PPA or the reciprocity. Sotomayor. I would have thought that was the problem, that you couldn't have a verdict in which six jurors relied on one and six jurors relied on another, and we don't know what happened. Yes. That is indeed a major problem, and reason enough by itself to throw it out. But the record in this case is close enough that it's simply not something we can conclude they wouldn't have deadlocked. And that's all that's necessary. I see my time has been up for a little while. We have some time for rebuttal. We'll hear from the government. Thank you. May it please the Court. My name is Matthew Podolsky, and I represent the United States on this appeal as I did at trial. What I'd like to do, given the focus of the arguments, is answer your question, about why the error as to the as-opportunities-arise instruction was harmless in this case. And I think I'll go briefly through the evidence, although some of it is in our brief. But Silver really controls here, and you can take Silver's analysis on this issue, apply it to the case here, and it's absolutely clear that the error was in the CPV side. Why do I say that? So in Silver, what the Court does, and I know, Judge Sullivan, you were on the panel, so I'm not going to tell you what you did, but as I read the opinion, what the Court did is looked at what the missing element was. What was the missing element? It was, was there an agreement? Was there an agreement between the bribe payor and the recipient as to a particular matter? And the reason that the real estate side, the error was harmless, was that throughout the life of this conspiracy, I think it was an 18-year scheme, at various points in time, not even at the beginning, but at various points in time, there was an agreement between the bribe payor and recipient as to particular matters, particular legislation to influence. And actually, it was the same result on the, on the side for the fact that the acts there were agreement to were outside of the statute of limitations. So how does that apply? Right, but the problem in, the problem in Silver is that the, the, one of the acts within the statute of limitations is a proclamation from the legislature that Dr. Taub is doing great work for misothelioma. And that was not enough, right? That was not part of the scheme. It's not that it wasn't an official act. It's that it wasn't part of the scheme or the agreement. So why isn't the ILO pay raise the same thing? So thank you, Your Honor. And I, I, that's actually really where I wanted to go. So let me answer your question first and then say why. We don't even have to reach that question. But the reason it's different is the ILO pay raise, just like the proclamation, was an official act. I don't think there's any dispute about that. Unlike the proclamation, there was an explicit agreement, an explicit discussion between Prococo and ILO, an explicit request for the action or to take action on the matter, that is the raise for the son, and then action on, on that matter. So in Silver is a very specific problem, a very specific problem, which is in the statute of limitations, there was no agreement between Taub and Silver as to the matter. Essentially, Silver says, and this was the sort of pure as opportunities arise theory that the opinion focused on, Silver says, I'm generally looking to help Taub. I, this proclamation will be beneficial to him. No evidence of any discussion with Taub that, that he wanted this official action. And the opinion, as I read it, makes clear that if there had been that discussion, if there had been that discussion, a matter would have sufficiently been identified and, and indeed, there would have been official action. But is it a matter, or if this case were tried today, would the jury be told that they need to find that there was agreement on a matter and that they had to agree on what matter it was? Is that, is that a concern here, that there are several matters and we can't be sure if the jury was unanimous as to any particular one? I don't think it's a concern for a few reasons. But one is the case that the government presented was much like the case in Silver where this wasn't an issue. Why do I say that? On the real estate side, the life of this scheme, there were ongoing payments and the payments came up for Silver to take action on. That's exactly how this case was tried. So focusing on the CPV side for the moment. My question is how can we be confident that the jury agreed unanimously on any particular matter, as opposed to six agreeing on one matter, six agreeing on a, on a different matter? Or a mix and match. Yes. That they, they found an agreement with respect to Core and relied on the official act with respect to the pay rates. So we know that the jury found that there was a quid pro quo, an exchange of action for, for money. The only question is, was a matter identified? Was a matter identified? We can be confident of that on harmless error review because each one of these matters, and there's really no dispute about this, was identified, was identified during the life of the scheme and the conspiracy explicitly, explicitly. So on CPV, on CPV, it starts at the dinner that Prococo's, Mr. Prococo's counsel just mentioned. There was an explicit discussion of the PPA. It's corroborated by numerous contemporaneous emails discussing Prococo exerting influence with respect to the PPA. So that's, for example, government Exhibit 85 talking about holding Howard Glazer's feet to the fire on, on the PPA. There is then, just like in Silver, just like in Silver, during the life of the scheme as there are ongoing payments, a separate discussion, a separate discussion about the reciprocity agreement. The payments are still ongoing. The jury has concluded that there was an understanding that money was an exchange for action. The missing piece is, was there a discussion about a particular matter? The answer is yes, and there can't be any doubt about it. It's in emails. It's in government Exhibits 74, 74A, 75, 75A. It's in government Exhibit 1708, which is a timeline of the events surrounding the reciprocity agreement. And it is explicit because how relays emails from Kelly to Prococo. Prococo then takes action all in the course of an email exchange. So there can be no doubt whatsoever that any rational jury would conclude that as part of this ongoing scheme, the, the bribed payer and the bribed recipient did agree on a particular matter to take action on. And it's the same with respect to the core side. In fact, I note that in Mr. Aiello's opening brief, I think it's on page 41, he, he says that the evidence showed, the only evidence in the case showed that there was an agreement to take action on the LPA. So there, there is a concession here that from the outset, there was a, there was evidence that a rational jury would conclude beyond a reasonable doubt the parties had agreed on a particular matter. And the evidence continued through the, through the other actions, the prioritizing of the release of certain funds, and the raise to Aiello's son, the testimony of Todd Howe, and the contemporaneous email record shows that the two parties agreed on specific, on specific matters. Now, I will, I will point out there's a slight difference on the core side, which is unlike in Silver and on the CPB side, there's not an ongoing stream of payments throughout. There's not an ongoing payment about stream of payments throughout, so it's connected to an initial sort of retainer payment at the very beginning. That was explicitly linked to the LPA. But it doesn't change the analysis, because the evidence in the case, the evidence through Todd Howe, the evidence through the contemporaneous email records, for example, a text message from Aiello relayed to Prococo on the raise, demanding that he, given and given and given, you need to do this for me, shows, prove the link that the jury found between, between these actions. And I will. I'm sorry, I'm not following that. Sure. You're saying there was no payment in connection with it, but they could find the link. I'm not sure if the payment preceded the request for the assistance to the son, how you could say that there was an understanding of that matter at the time payment was accepted. Right. So this gets at a point left, I'd say left open in Silver, which is an example in several places is, refers to a promise at the time of the payment, excuse me, an agreement as to a particular matter at the time of the payment or the promise. So it could be that the agreement is actually coalesced over time. There's a payment at time A, and at time B, the bride payer says, okay, now here's the matter. Here's the particular matter that we, that I want you to take that way. I had understood Silver, and perhaps Judge Sullivan is better qualified to ask this question or ask a question than I am on, that the anticipation in Silver was payment could come after the promise. And so you either agree on the matter right at the start or at least by the time of the payment. So when you have a chance to say, no, no, don't give me that money, you know what matter it is you're committing yourself to provide assistance on. You're saying it can be the reverse? I am, Your Honor. And two reasons I say that about the opinion. One is, first, the way that the proclamation is analyzed. There's particular language that says the problem with that was that there was never any discussion, do you actually want that, leaving open the possibility and, indeed, implication that if Silver and Taub had a discussion, was this something you wanted, that would suffice to have specified a matter. I'll also... I'm not sure I follow that because then I'm not sure what Silver is limiting. Then as you ask for an action, the action is going to pertain to a matter. And so if you agree to do it, it seems to me you've swallowed what Silver said was not covered by the opportunity-arise theory. What am I missing? Yeah. So let me try to be as precise as I can, and I'll also refer to another portion of the opinion in Silver. In Silver, what was pointed out, a problem with the proclamation was Silver never discussed with Taub the proclamation, and there was no evidence that they had any discussion. The issue there was Silver basically just took it upon himself, and this was why I called it a pure as opportunities arise. The notion was he was just out there looking for things that he thought might benefit Taub, not things that he had discussed, matters he had discussed with Taub. So there was actually never a discussion, never a promise between or agreement between Silver and Taub with respect to the proclamation at any point in time. And I'll note that in Footnote 7 and in Judge Loyer's concurring opinion as well, it's at time A, there's a promise made or a payment made in exchange for an action or matter to be determined later. So I think that is clearly reserved in Silver, and the issue in Silver was that the proclamation, there was never any meeting of the minds, never any discussion, never any agreement. But I do want to kind of pull back the discussion for a minute, because at the end of the day, there actually was a matter explicitly discussed between ILO and ProCoCo on numerous occasions, and that was the LPA. So even from the inception of the scheme, the payments were explicitly linked to a particular matter. As I said, the point is actually suggested if not made in ILO's brief, and the evidence is extremely powerful on that, how repeatedly testified the reason I thought to bring together ILO and ProCoCo, and by the way, on this point, it was particularly ILO from the beginning, not Girardi, was because ILO had this problem with the LPA in the summer of 2014. And the email record corroborates that. I mean, there are emails back and forth explicitly discussing it, and ILO making a particular request. Can JP help with this? Before the payments are made. So the payments, the evidence here is absolutely clear and really beyond dispute that there was a particular matter identified. I know counsel's time is up, but may I ask you one question about Mr. ProCoCo's status while not holding office? Of course. Do you agree that for Mr. ProCoCo to be guilty of conduct while he wasn't in office, the jury had to find that he was a fiduciary? I do. Okay. I want to be sure I understand the government's theory on which, on why he was a fiduciary owing a duty to the public during that time when he was out of office. Sure. I mean, is it basically that his leaving office was a scam, that he never really left office? Is that basically the government's theory? That's it. And I don't want to suggest, I mean, yes, I like the word scam, but it's, our purpose of, it was purposely deceitful that he left office. Is that, in fact, he didn't leave office. It's that he went a few blocks down the street to run the governor's re-election campaign. Your theory is that he wasn't exercising, at least in the transactions that are issued in this lawsuit, the power of a lobbyist or a lobbyist, that he wasn't exercising derivatively gubernatorial power. Is that it? Absolutely. Because I may have some questions for you on rebuttal for your adversaries. I want to make sure I understand your theory. Thank you. Absolutely. And the evidence was quite powerful on this point. Judge Caproni and her decision on a bail pending appeal went through a lot of the evidence, so I'm not going to try to go through all of it right now. But I'll just point out a few, make a few comments. One is there was testimony by officials, for example, Andrew Kennedy, who was an executive chamber official in charge of economic development, saying that it didn't matter if he was in the, literally on the payroll under his title of executive. I understand that. I didn't ask you for a sufficiency question. I just wanted to make sure that there wasn't some other theory. Understood, Your Honor. Yes. And so let me just answer your question very directly then. Absolutely. Joseph Prococo here exercised the same, the proof, the same type of authority and fiduciary duty that he did, whether or not he was on the state's payroll or not. He had command over the, command over employees. He had power to dominate and control. He was relied on by his, by other members of the executive department. So the answer, the rebuttal. I'd just like to make three points. First of all, with respect to counsel's discussion of the fact that we did concede that there was sufficient evidence of an agreement on the LPA, that is a very different question from whether there, this instructional error requires a new trial. We haven't had a chance to brief the standard in detail, but I'll just, and I would request that the Court grant our motion for supplemental briefing on this issue, but I just want to point out one example of many, Judge Lynch's decision in Lynch v. Dolce, actually a habeas case, it's 789F3-303, 317 to 318. The question is not whether the evidence is sufficient to support a verdict, but whether there is no reasonable possibility that a properly instructed, that the instructional error affected the jury's verdict. And one other comment on that with regard to what counsel said about Girardi, the citations to the Howe testimony about Girardi's knowledge of the payments are at Appendix 567, 2409-10, Appendix 573, 2476-77, and Trial Transcript 2096-97. Secondly, counsel's reading of the silver opinion is so broad that, as to make the opinion virtually meaningless, the opinion makes clear that the relevant point in time, and I'm reading from it, in a quid pro quo bribery scheme is the moment at which the official public official accepts the payment. And then there are, to the extent there are other parts of the opinion that expand that, they say that a particular question or matter must be identified at the time the official makes a promise or accepts a payment. So the notion that you could use the point in time a year after the payments when the request was made relating to the son's raise would completely eviscerate the holding of silver. And — But wait. I mean, imagine a scenario where they say, look, you know, we've been paying you a ton to get this core advantage. We now think we're entitled to a little more, so we'll keep paying you, but I want a raise for my son. Would that be sufficient under silver to support a conviction? Your Honor, that might be different, but that's not the facts here. The facts here, there's no promise of any further payment. There's no reference to any further payment. And indeed, to the extent — Well, if there's an acknowledgment, there doesn't need to be — I mean, I'm — the job is — the payments are being made. The payments are going to be ongoing. But we want more bang for our buck at this point. They renegotiate. I guess — That would be sufficient, wouldn't it? That might be sufficient, but that's not the case. The facts here, my point is the payments were made and were finished a year earlier. There was no suggestion there would be additional payments. And the jury — this is not a retainer theory case, to the extent there's a difference between a retainer and an as-opportunities-arise, which the Court alluded to in, I think it was footnote 7. This jury was instructed, just like the silver jury, on an as-opportunities-arise theory, not a payment. Then, if Your Honor would indulge me, I do have one additional point, which is that it's really important that the Court keep in mind I did not get a chance to argue the Margiotta point, but I would say this. With respect to the purported agreement about the labor-peace agreement, in order to find that — that that had been proven, the jury would have had to find domination and control, and that Mr. Aiello knew that. And there's no way this Court could be certain that that's what the jury found, as opposed to relying on the son's raise and the divergent verdict with the co-defendant is evidence of that. That it's certainly, at a minimum, this Court can't be sure that that's what the jury — that the jury relied on the earlier act rather than the later one. And that's enough to get us a new trial and, indeed, to require one. And the other thing I wanted to point out with respect to the — Sotomayor, there was no request for the jury to be charged, that they had to find agreement as to each of — I mean, I understand Silver had not come down yet, but there was no request to charge that the jury had to be unanimous as to the son's raise versus the LPA versus whatever other matters were — No. But the objection to the as-opportunities-arise theory and the request that the jury be charged the way Silver says it should have been charged was certainly preserved, and there's no other argument. No, I'm not suggesting it wasn't preserved. I'm just saying that to the extent you've now just argued, we don't know whether the jury would have found on the son's — son's raise alone versus the LPA — the labor peace agreement. There was never a request to charge the jury that they had to be unanimous as to one or the other or any theory. I didn't see that. I'm not sure whether that's the case or not, but there were certainly — I'm not sure whether that's the case or not. I would point out that the Supreme Court decision in the Conrad Black case, which was a companion to Skilling, holds that you don't have to ask, for example, for a special verdict as to different objects. I wasn't suggesting a special verdict. I was suggesting that you didn't ask for them to be charged, that they had to be unanimous as to a particular matter. I — you know, I'm not positive. I apologize. Your Honor, I didn't try the case, so I can — I can let the Court know in a letter. But I did want to — I'm sorry, Your Honor. Can I just say one more thing? With respect to the Margiotta case, and obviously we briefed that fully, the Margiotta issue, I just want to highlight one point that, unfortunately, we didn't make in the briefs, which is that in this Court's en banc decision in Rubicchi, which is cited for another reason in the government's brief, at pages 144 to 145, this Court specifically held that decisions about honest services fraud rendered prior to McNally and prior to the enactment of 1346 are not binding. And so Margiotta is not binding, and as for all the reasons in the briefs, we respectfully submit that it is — should be a dead letter under Skilling and McDonald. Thank you. Mr. Yeager. Okay. CPV never got the power-purchase agreement. They did get the reciprocity agreement. Prococo didn't get it for them, but they got it. That really could have been quite influential for the jury in their decision. Now, the indictment says that this arrangement began in 2012. The government repeatedly made clear that they were not arguing that payments — that there was an agreement just at the time of the payments. They said it was earlier, and they made this clear to the jury in their arguments as well. Quote, when the opportunity came up for Prococo to use his power to get the reciprocity agreement, he did it to benefit CPV, and that's what he agreed to do at that dinner. It wasn't at the time the payments were gotten. It was the dinner. Putting aside the issues with Silver, discussed ably by my colleague, the government can't run from how they actually charged this case. We would have defended it very differently. Mrs. Prococo didn't testify. If the payments to her were the point of agreement, she may well have. There were a lot of decisions made on this and major prejudice for switching this theory after the fact. Now, in addition, this idea that there was some separate discussion of the reciprocity agreement is also ridiculous. There was one e-mail chain after which Mr. Prococo takes no action, none. He says to Mr. Howe, while his mother is dying in a hospice, please ask Howard or Regan to help with this. Mama's not doing well. That's it. And he does nothing else. Mr. Howe may forward those e-mails. That's it. There is un ---- It's not quite it, right, because then there are the exchanges where Glaser and Martens copy not only the interested parties, but Prococo. I think the government's theory is that that shows that he was more than a bystander here, that they felt they needed to keep him informed of all of this. The carbon copy theory is that he is a bystander. They're supposed to have overwhelming evidence. No, no. I understand your argument, but that's the one where you say all there was was the other. That's the other piece that they're relying on. Yes, Your Honor. I submit that prosecutors with overwhelming evidence do not rely on carbon copies. Putting that aside, going to the PPA, the idea that there is explicit discussion of the PPA apart from this dinner is also quite weak. E-mails on which Mr. Prococo is not copied, they have to rely on Mr. Howe's testimony about that dinner. And all Mr. Howe says happened at that dinner, all the only nature of the promise at that dinner is that Mr. Prococo would keep abreast of or keep an eye on the project. That's not an official act. This just isn't overwhelming evidence. They can't get there. Now, I also want to touch briefly on the fiduciary duty aspect of this on the core side of the case. The government has said that Mr. Prococo was acting the same when he became the campaign manager. That's absurd. There is not overwhelming evidence of that. And did he leave office? Of course he did. He signed a resignation letter. He got an ethics opinion about what a former employee was obligated to get. Andrew Ball testified, well, when he was on the campaign, he wasn't my boss. The government resorted to putting a picture up of when Prococo was campaign manager and he was wearing a sweater that had the government seal on it. And they said, ah, that's evidence. Well, there was testimony that it didn't matter that he wasn't on the payroll, that others treated him as if he were still part of the governor's staff. Wasn't there such evidence? Not really of any real weight at all. Mr. Agata said that he kept his office. No. Many people used that office. He used a landline in that office, which Mr. Ball testified many people were coming in and out of to use that landline. This is not overwhelming evidence. This is not the sufficiency standard. They don't have this. It's really quite weak. May I ask you on this, how this came up initially on whether a private citizen could owe a duty of honest services. Mr. Prococo raised it and the court responded to that by saying, yes, a private citizen could owe a duty of honest services if he was a fiduciary, a public fiduciary. And that appears to be correct under the case law. The court then charged the jury that he would have to owe a fiduciary duty to the public. And if I understand it, that was the instruction that your client basically asked for on that point. So I understand where you've preserved a challenge to whether or not a private citizen can owe a duty of honest services. But I don't see where you've preserved an objection to how the court charged that a private citizen could owe such a duty if a fiduciary. I do believe it's preserved. Among other things, we actually asked for a different charge on Margiotta. At that point, when we were forced to that position by the court, it's a transcript 5839. We asked that the jury must find that the person so dominated a particular governmental institution. The court said any governmental business. So Margiotta is a boss tweed of Nassau. That's dominating an entire governmental institution. The district court took an instruction which is- Mr. Margiotta is someone who never held public office. The unique aspect of this case is that Mr. Prococo held public office both before and after some of the events at issue. And the question is whether in the middle, when he wasn't technically on the government payroll, he effectively continued to use that office. Your Honor, another important difference in Margiotta versus Prococo is that in Margiotta, the indictment alleged official acts performed by actual officials in the town of Nassau and the other town at issue. This indictment says that the official acts are performed by Prococo when he is not an official. Margiotta, really, when you get into the details of it, shouldn't even be that helpful. It's a confusing and messy case. And the court made many moves on that that I disagree with. But I do believe we even objected to the particular instruction they gave. And on a harmless error standard, that instruction would not suffice. One last thing, if I could, which is that I just want to emphasize that this Court has held in United States against Stewart, that the strength of the government's case is the most critical factor in assessing whether error was harmless. And that, quote, given the difficulty of objectively evaluating this factor, appellate courts often look to the length of jury deliberations and the necessity of a modified Allen charge as useful proxies. There are other court decisions by the Second Circuit, which also point out the importance of a deadlock. All of that was true here. This is not overwhelming evidence. We would certainly like an opportunity to brief this to the court after argument. Thank you. We'll reserve decisions.